TRACY L. WILKISON
Acting United States Attorney
SCOTT M. GARRINGER
Assistant United States Attorney
Chief, Criminal Division
POONAM G. KUMAR (Cal. Bar No. 270802)
ROGER A. HSIEH (Cal. Bar No. 294195)
GREGORY D. BERNSTEIN (Cal. Bar No. 299204)
Assistant United States Attorneys
Major Fraud/General Crimes Sections
    1100 United States Courthouse
    312 North Spring Street
    Los Angeles, California 90012
    Telephone: (213) 894-0719/0600/3183
    Facsimile: (213) 894-6269
    E-mail:    poonam.kumar@usdoj.gov
            roger.hsieh@usdoj.gov
            gregory.bernstein@usdoj.gov

Attorneys for Plaintiff
UNITED STATES OF AMERICA

UNITED STATES DISTRICT COURT

FOR THE CENTRAL DISTRICT OF CALIFORNIA

| UNITED STATES OF AMERICA, | No. CR 19-282-RGK |
|---|---|
| Plaintiff, | GOVERNMENT'S OPPOSITION TO DEFENDANTS' MOTION TO DISMISS |
| v. | Hearing Date: July 19, 2021 |
| ZHONGTIAN LIU, | Hearing Time: 1:30 P.M. |
| aka "Liu Zhongtian," | Location:    Courtroom of the |
| aka "Chairman," | Hon. R. Gary |
| aka "Uncle Liu," | Klausner |
| aka "UL," | |
| aka "Big Boss," | |
| CHINA ZHONGWANG HOLDINGS | |
| LIMITED, | |
| aka "ZW," | |
| aka "Mother Ship," | |
| ZHAOHUA CHEN, | |
| aka "Chen Zhaohua," | |
| aka "Uncle Chen," | |
| XIANG CHUN SHAO, | |
| aka "Johnson Shao," | |
| PERFECTUS ALUMINIUM INC., | |
| aka "Perfectus Aluminum Inc.," | |
| PERFECTUS ALUMINUM ACQUISITIONS, LLC, | |
| SCUDERIA DEVELOPMENT, LLC, | |
| 1001 DOUBLEDAY, LLC, | |

VON KARMAN – MAIN STREET, LLC,
   and
10681 PRODUCTION AVENUE, LLC,

          Defendants.

     Plaintiff United States of America, by and through its counsel of record, the Acting United States Attorney for the Central District of California and Assistant United States Attorneys Poonam G. Kumar, Roger A. Hsieh, and Gregory D. Bernstein, hereby files its Opposition to Defendants' Motion to Dismiss Indictment (Dkt. 186).

     This Opposition is based upon the attached memorandum of points and authorities, the declaration of Poonam G. Kumar and the exhibits thereto, the files and records in this case, and such further evidence and argument as the Court may permit.


 Dated: June 28, 2021          Respectfully submitted,

                               TRACY L. WILKISON
                               Acting United States Attorney

                               SCOTT M. GARRINGER
                               Assistant United States Attorney
                               Chief, Criminal Division


                                   /s/
                               _____
                               POONAM G. KUMAR
                               ROGER A. HSIEH
                               GREGORY D. BERNSTEIN
                               Assistant United States Attorneys

                               Attorneys for Plaintiff
                               UNITED STATES OF AMERICA

**TABLE OF CONTENTS**

<u>DESCRIPTION</u>                                                                    <u>PAGE</u>

I.    INTRODUCTION...................................................1

II.   STATEMENT OF FACTS.............................................2

III.  PROCEDURAL HISTORY............................................6

IV.   THE WIRE FRAUD COUNTS ARE DOMESTIC APPLICATIONS OF THE
      STATUTE.......................................................7

      A.    The Indictment Charges Domestic Applications of the
            Wire Fraud Statute......................................8

            1.    An Analysis of Whether the Wires were Merely
                  Incidental Is Not Required........................9

            2.    The Wires Were Central to the Scheme to Defraud.....11

            3.    There Are Substantial Contacts Between the
                  Charged Conduct and the United States...............12

      B.    The Wire Fraud Statute Applies Extraterritorially........16

V.    THE INDICTMENT STATES THE OFFENSE OF CUSTOMS FRAUD..........16`

VI.   DEFENDANTS' ARGUMENT AS TO THE CONSPIRACY TO COMMIT WIRE
      FRAUD IS MISPLACED..........................................18

VII.  CONCLUSION...................................................20

# TABLE OF AUTHORITIES

DESCRIPTION                                                                PAGE

**CASES**

Cleveland v. United States,
    531 U.S. 12 (2000)..................................................20

European Cmty v. RJR Nabisco,
    764 F.3d 129, 141 (2d Cir. 2014)...............................16

Kelly v. United States,
    140 S. Ct. 1565 (2020)........................................20

Laydon v. Mizuho Bank, Ltd.,
    12-CV-3419-GBD, 2015 WL 1515487 (S.D.N.Y. Mar. 31, 2015)......14

Morrison v. Nat'l Australia Bank Ltd.,
    561 U.S. 247 (2010).........................................8

Nestle USA, Inc. v. Doe,
    --- S. Ct. ----, 2021 WL 2459254 (U.S. June 17, 2021)........14

Pasquantino v. United States,
    544 U.S. 349 (2005).................................14, 16, 20

Perfectus Aluminum Inc. v. U.S. Aluminum Extrusions Fair Trade
    Comm.,
    836 Fed. Appx. 883 (Fed. Cir. 2020)..........................18

Petroleos Mexicanos v. SK Eng'g & Constr. Co. Ltd.,
    572 Fed. Appx. 60 (2d Cir. July 16, 2014)....................13

RJR Nabisco, Inc. v. European Cmty.,
    136 S. Ct. 2090 (2016)........................................8

Shaw v. United States,
    137 S. Ct. 462 (2016).........................................17

United States v. Ali,
    620 F.3d 1062 (9th Cir. 2010)................................20

United States v. Ballestas,
    795 F.3d 138 (D.C. Cir. 2015)................................11

United States v. Bonanno,
    852 F.2d 434 (9th Cir. 1988).................................19

United States v. Boren,
    278 F.3d 911 (9th Cir. 2002).................................20

United States v. Brandon,
    17 F.3d 409 (1st Cir. 1994)..................................19

1

**TABLE OF AUTHORITIES (CONTINUED)**

2   DESCRIPTION                       PAGE

3  United States v. Chen,
      324 F.3d 1103 (9th Cir. 2003)...................17
4

United States v. Coffman,
5      771 F. Supp. 2d 735 (E.D. Ky. 2011).............15

6  United States v. Elbaz,
      332 F. Supp. 3d 960 (D. Md. 2018)..............14
7

United States v. Falcone,
8      960 F.2d 988 (11th Cir. 1992) (en banc).........19

9  United States v. Firtash,
      392 F. Supp. 3d 872 (N.D. Ill. 2019)...........10
10

United States v. Gabrion,
11     517 F.3d 839 (6th Cir. 2008)...................19

12  United States v. Garlick,
     240 F.3d 789 (9th Cir. 2001)....................8
13

United States v. Gasperini,
14    16-CR-441-NGG, 2017 WL 2399693 (E.D.N.Y. June 1, 2017).......15

15  United States v. Georgiou,
    777 F.3d 125 (3d Cir. 2015)...................16
16

United States v. Hayes,
17    99 F. Supp. 3d 409 (S.D.N.Y. 2015)............15

18  United States v. Hussain,
    972 F.3d 1138 (9th Cir. 2020)............passim
19

United States v. Kazzaz,
20    592 Fed. Appx. 553 (9th Cir. 2014)............15

21  United States v. Lazarenko,
    564 F.3d 1026 (9th Cir. 2009).................17
22

United States v. Maddux,
23    917 F.3d 437 (6th Cir. 2019)..................20

24  United States v. McLellan,
    959 F.3d 442 (1st Cir. 2020)..................10
25

United States v. Napout,
26    963 F.3d 163 (2d Cir. 2020)...................15

27  United States v. Prevezon Holdings, Ltd.,
    122 F. Supp. 3d 57 (S.D.N.Y. 2015)............14
28

**TABLE OF AUTHORITIES (CONTINUED)**

DESCRIPTION                                                                 PAGE

United States v. Sidorenko,
       102 F. Supp. 3d 1124 (N.D. Cal. 2015)......................12, 14

United States v. Singhal,
       876 F. Supp. 2d 82 (D.D.C. 2012)...............................15

United States v. Staggs,
       No. 18-CR-385-SI, 2020 WL 7625229 (D. Or. Dec. 22, 2020)......17

United States v. Tavelman,
       650 F.2d 1133 (9th Cir. 1981)..................................18

**STATUTES**

18 U.S.C. § 1343..........................................6, 16

**OTHER AUTHORITIES**

Ninth Circuit Model Criminal Jury Instruction No. 8.20
       (2010 ed.).....................................................19

Ninth Circuit Model Criminal Jury Instruction No. 8.21
       (2010 ed.).....................................................19

Ninth Circuit Model Criminal Jury Instruction No. 8.36
       (2010 ed.).....................................................17

**RULES**

Fed. R. Crim. P. 7........................................10, 17

**MEMORANDUM OF POINTS AND AUTHORITIES**

**I.    INTRODUCTION**

For over a decade, between 2008 and 2019, the defendants, including six U.S.-based corporations, executed a wide-ranging conspiracy to defraud investors in a publicly-listed company, evade over $1.8 billion in anti-dumping and countervailing ("AD/CVD") duties owed to the U.S. Treasury and Customs & Border Protection ("CBP"), and move hundreds of millions of dollars through accounts in the U.S. to promote the investor fraud and evasion of AD/CVD duties. Defendant Zhongtian Liu ("defendant Liu"), who was the Chairman of defendant China Zhongwang Holdings, Limited ("defendant CZW"), an aluminum extrusion company publicly listed on the Hong Kong Stock Exchange, was the mastermind of the scheme.  However, defendant Liu could not execute the scheme on his own; to execute it, he collaborated with persons and entities in the U.S., namely, the U.S.-based defendants Perfectus Aluminium Incorporated ("Perfectus"), Perfectus Aluminum Acquisitions LLC ("Perfectus Acquisitions", collectively with Perfectus the "Perfectus defendants"), Scuderia Development LLC ("Scuderia"), 1001 Doubleday LLC ("Doubleday"), Von Karman-Main Street LLC ("Main Street"), and 10681 Production Avenue LLC ("Production Avenue", collectively with Scuderia, Doubleday, and Main Street the "Warehouse Defendants"), defendant Zhaohua Chen ("defendant Chen"), defendant Xiang Chun Shao ("defendant Shao"), and others.

Together, defendants and their co-conspirators fraudulently inflated the value of defendant CZW by falsely representing, among other things, that defendant CZW was selling aluminum to real customers, including the Central District of California ("CDCA")-

1  based Perfectus defendants, when, in fact, defendants Liu and CZW
2  controlled the Perfectus defendants, funded the Perfectus defendants,
3  and directed the Perfectus defendants to "purchase" aluminum from
4  defendant CZW.  When in 2011, the Department of Commerce ("DOC")
5  imposed AD/CVD duties of approximately 400% on imports of aluminum
6  extrusions from certain Chinese aluminum manufacturers, including
7  defendant CZW, defendants had to find another way to "sell" aluminum
8  to the Perfectus defendants without having to pay the AD/CVD duties.
9  So, they agreed to smuggle extrusions into the U.S. by disguising the
10 extrusions as pallets.  To keep the wire scheme going, the aluminum
11 was concealed in over 2 million square feet of warehouse space in
12 Southern California owned by the Warehouse defendants.  To ensure the
13 scheme was a success, defendants Liu, Chen, and CZW transferred
14 hundreds of millions of dollars to the Perfectus defendants that was
15 then transferred back to defendant CZW as fraudulent revenue.

16     The U.S.-based Perfectus and Warehouse defendants now seek
17 dismissal of all counts but one of the Indictment, claiming the wire
18 fraud charges are an improper extraterritorial application of federal
19 law and the customs fraud charges do not properly state an offense.
20 Because the wire fraud charges are domestic applications of the
21 statute and the customs fraud charges allege each element of the
22 offense, defendants' motion should be denied.

23 **II.  STATEMENT OF FACTS**

24     Since its inception, defendant Liu has been the majority owner
25 of defendant CZW, the largest aluminum extrusion company in Asia.
26 (Indictment ("Ind.") ¶¶ 2-3.)  In May 2009, defendant CZW became
27 publicly listed on the Hong Kong Stock Exchange following one of that
28 year's largest Initial Public Offerings.  (Id. ¶¶ 5, 34 (Overt Act

2

("OA") 11).)  As a result of the IPO, defendant CZW raised $1.26 billion.  (Id. ¶ 5.)  The scheme to fraudulently inflate the value of defendant CZW began before defendant CZW was publicly-listed when, in advance of the IPO, defendants Liu, CZW, and Chen caused $200 million to be wired to a bank account in the U.S. controlled by a co-conspirator in 2008.  (Id. ¶¶ 33(a)(i)(I), 33(c), 34 (OAs 1, 3-6, 10).)  At defendant Liu's direction, these funds were then wired back to defendant CZW as a purported "loan" from Scuderia.  (Id.)  In defendant CZW's IPO prospectus, defendants Liu and CZW misrepresented this transaction as a real loan from an independent third party, failing to disclose that the "loan" originated with defendant Liu and that defendants Liu and CZW did not intend to repay it.  (Id.)

After the completion of the IPO, defendants Liu and CZW began reporting tremendous growth of defendant CZW's aluminum sales to the U.S.  For instance, through annual reports, defendants Liu and CZW told investors that defendant CZW's revenue from the U.S. accounted for 40.8% and 29.1% of the company's overall revenue in 2009 and 2010, respectively, up from only 1.8% in 2008.  (Id. ¶ 34 (OAs 14, 23).)  Defendants Liu and CZW represented that this revenue was derived from true arms-length transactions when, in fact, defendants Liu and CZW had directed entities under their control, including the Perfectus defendants[1] in CDCA, to "purchase" the aluminum and had provided the funds to purchase the aluminum.  (Id. ¶¶ 11, 33(a)(i)(II)-(III), 33(d)-(g).)  To create the appearance that

---

[1] Prior to the creation of Perfectus, there were seven "Perfectus predecessor entities" in CDCA that imported aluminum from defendant CZW.  (Ind. ¶¶ 11-12.)  These "Perfectus predecessor entities" merged into the Perfectus defendants in late 2014.  (Id. ¶¶ 16-18.)  Herein, the Perfectus defendants refers to the defendant-entities as well as the Perfectus predecessor entities.

defendant CZW's aluminum sales to the U.S. were legitimate
transactions, defendant Liu used the Warehouse defendants to purchase
warehouses in CDCA to stockpile the aluminum. (Id. ¶¶ 19-22,
33(a)(i)(III), 33(j), 33(x), 34 (OAs 7, 9, 12, and 78).)

In 2011, defendant Liu's plan to drive up defendant CZW's U.S.-
derived revenue encountered an obstacle. That year, the DOC imposed
AD/CVD duties of 33.28% and 374%, respectively, on the aluminum
extrusions CZW exported to the U.S. (Id. ¶¶ 26-28.) Following the
order, defendants Liu and his co-conspirators, including the
Perfectus defendants, Warehouse defendants, defendant Shao, and
defendant Chen, smuggled defendant CZW's aluminum extrusions into
CDCA by disguising them as aluminum "pallets". (Id. ¶¶ 33(a)(ii)-
(iii), 33(x)-(cc), 34.) Defendants then conspired to lie to CBP and
describe these "pallets" upon importation as finished products, when,
in fact, defendants knew they were not finished products, there was
no market or customers for the "pallets," and defendants intended to
melt the pallets at facilities owned by defendants Liu and CZW in New
Jersey and Southern California. (Id. ¶¶ 33(aa)-(cc), 34 (OAs 35,
36).) To further the wire and customs fraud schemes, defendants Liu
and CZW caused defendant CZW's annual reports to falsely claim there
was an increasing demand for the pallets in the U.S., when, in fact,
there were no customers. (Id. ¶ 33(h).) Lacking legitimate buyers,
defendants Liu and CZW directed the Perfectus defendants to purchase
the pallets, which were ultimately stored at the warehouses owned by
the Warehouse defendants as well as at defendant Liu's New Jersey
facility. (Id. ¶¶ 33(a)(i)(III), 33(j), 33(r)(ii), 33(s).) Since
the Perfectus defendants were not selling the pallets to customers,
they did not have the funds to pay for the pallets. So, defendants

Liu, CZW, and Chen used Hong Kong shell companies to wire hundreds of millions of dollars into bank accounts held by the Perfectus defendants in CDCA, which then returned the money to defendant CZW in the form of payments for the aluminum. (Id. ¶¶ 33(a)(iii), 33(k)-(p), 34 (OAs 54, 56, and 58-87, among others).)

For several years, the criminal scheme worked. Between the issuance of the AD/CVD order and 2014, defendant CZW fraudulently "sold" 2.2 million aluminum pallets to the Perfectus defendants, all while evading the AD/CVD order and falsely reporting to defendant CZW's investors the sales as revenue from the U.S. (Id. ¶¶ 33(h), 33(r), 34 (OAs 30, 40, 45, and 86).) In that time, consistent with the fact that defendant CZW's aluminum pallets were never finished merchandise, the Perfectus defendants never sold the aluminum pallets to end-users, and instead simply hid them in warehouses in CDCA owned by the Warehouse defendants. (Id. ¶ 33(h)-(j).)

In 2015 and 2016, defendants' scheme began to be exposed. (Id. ¶¶ 33(t)-(w), 34 (OAs 89-91, 95-96).) In response, defendants Liu and CZW made specific disclosures to investors, falsely stating that the aluminum sales to the Perfectus defendants were arms-length transactions. (Id.) To ensure the continued success of their wire fraud scheme to defraud investors, defendants Liu and CZW similarly disclaimed any connection with the Perfectus defendants or the factories owned by defendant Liu in Mexico and Vietnam. (Id. ¶¶ 33(t), 34 (OA 90-92).) Then, to conceal the fact that he had been stockpiling defendant CZW's aluminum pallets for years, defendant Liu ordered the aluminum pallets in the CDCA warehouses exported to his company in Vietnam. (Id. ¶¶ 25, 34 (OAs 91-92).)

1    **III. PROCEDURAL HISTORY**

2        In May 2019, a grand jury returned a 24-count Indictment against

3    10 defendants, including the Perfectus and Warehouse defendants.

4    Count One alleges that defendants violated 18 U.S.C. § 371, in two

5    ways, by conspiring (1) to defraud the U.S., specifically CBP, (Ind.

6    ¶ 32); and (2) to commit offenses against the U.S., namely, wire

7    fraud, in violation of 18 U.S.C. § 1343; passing false and fraudulent

8    papers through the customhouse, in violation of 18 U.S.C. § 545; and

9    international promotional money laundering, in violation of 18 U.S.C.

10   § 1956(a)(2)(A) (Id. ¶ 32(a)-(c)).  The offenses identified as

11   objects of the conspiracy are predicated on allegations of the

12   following: a wire fraud scheme to defraud investors in defendant CZW;

13   a customs fraud scheme to evade payment of $1.8 billion in AD/CVD

14   duties owed to CBP and the U.S. Treasury; and the engagement in

15   monetary transactions to promote the wire fraud and customs fraud

16   schemes.  (Id. ¶ 33(a)(i)-(iii).)  The Indictment also alleges nine

17   counts of wire fraud (Counts Two through Ten), seven counts of

18   customs fraud (Counts 11 through 17), and seven counts of

19   international promotional money laundering (Counts 18 through 24)[2].

20       After the Indictment was unsealed in July 2019, while actively

21   litigating civil forfeiture matters before the Honorable Dolly M.

22   Gee, the Perfectus and Warehouse defendants failed to appear as

23   required by the Court-issued summonses.  (Dkts. 55, 57, 59, 64, 149

24   at 2.)  As a result, this Court found the Perfectus and Warehouse

25   defendants in contempt and issued a total judgment of approximately

26   $5.8 million against them.  (Dkts. 59, 64, 74-80, 151-52.)  In April

27   

28       [2] The Warehouse defendants are not charged in the substantive
money laundering counts.

2021, after the Honorable Dolly M. Gee granted the government's request to strike defendants' civil forfeiture claims based on their refusal to appear in the criminal case, the Perfectus and Warehouse defendants appeared.  (Dkts. 127-32, 149 at 2-3.)  To date, defendant CZW has failed to appear and sanctions continue to accrue against it. (Dkt. 177.)  Defendants Liu, Chen, and Shao also have not appeared.

After failing to appear for nearly eight months and with trial scheduled for August 10, 2021, the Perfectus and Warehouse defendants have now filed a motion to dismiss nearly all the counts of the Indictment.  Defendants do not challenge the conspiracy to defraud the U.S. charged in Count One.  Rather, they argue that the Indictment fails to properly allege wire and customs fraud, and, therefore, the conspiracy to commit those offenses, the substantive offenses themselves, and the money laundering counts all fail.[3] These claims lack merit.  The Indictment properly alleges wire and customs fraud and, accordingly, defendants' motion should be denied.

## IV.   THE WIRE FRAUD COUNTS ARE DOMESTIC APPLICATIONS OF THE STATUTE

The Indictment properly pleads a conspiracy to commit wire fraud (Count One) and nine substantive counts of wire fraud (Counts Two and Ten).  The U.S.-based Perfectus and Warehouse defendants contend that these counts should be dismissed because they are impermissibly extraterritorial.  (Def. Mot. at 11-16.)  Defendants are wrong.[4]

---

[3] Since the money laundering charges in the indictment require the government to prove that the funds were used to promote the carrying on of the wire fraud and customs fraud schemes, the money laundering charges rely on the viability of the wire fraud and customs fraud charges.  Because, as set forth below, the wire and customs fraud charges are properly pled, the Court should not dismiss the money laundering charges.

[4] If the Court holds that the substantive wire fraud counts are domestic in nature, then the Court should similarly find that the
*(footnote cont'd on next page)*

"Absent clearly expressed congressional intent to the contrary, federal laws will be construed to have only domestic application." RJR Nabisco, Inc. v. European Cmty., 136 S. Ct. 2090, 2100 (2016). To determine whether a case seeks an impermissible extraterritorial application of a statute, a court must determine whether Congress affirmatively indicated an intention for the statute to apply extraterritorially and, if not, whether the application sought in the case is impermissibly foreign in nature.  Morrison v. Nat'l Australia Bank Ltd., 561 U.S. 247, 265-66 (2010); Hussain, 972 F.3d at 1142. This Court need not conduct the two-step inquiry in sequence; it may start at step two, because if the statutory application is domestic in nature, there is no need to determine whether the statute applies extraterritorially.  Hussain, 972 F.3d at 1142-43.  Here, each wire fraud count charged a wire transmission into or out of the CDCA. Thus, the Indictment charges domestic applications of the wire fraud statute, which, in any event, applies extraterritorially.

### A.   The Indictment Charges Domestic Applications of the Wire Fraud Statute

A case involves a domestic application of a statute if "the conduct relevant to the statute's focus occurred in the United States . . . even if other conduct occurred abroad." RJR Nabisco, 136 S. Ct. at 2101.  Last year, the Ninth Circuit held that the focus of the wire fraud statute "is the use of the wires in furtherance of a scheme to defraud."  Hussain, 972 F.3d at 1145; see also United States v. Garlick, 240 F.3d 789, 792-93 (9th Cir. 2001) ("The focus of the mail and wire fraud statutes is upon the misuse of the

conspiracy to commit wire fraud, as charged in Count One, is domestic in nature.  See United States v. Hussain, 972 F.3d 1138, 1145 n.3 (9th Cir. 2020).

instrumentality of communication." (citations and internal quotations omitted)).  Thus, as "long as [the defendants'] use of the wires in furtherance of [the] fraud had a sufficient domestic nexus," the charges involve "permissible domestic application[s]" of the statute. Hussain, 972 F.3d at 1145.

Each substantive wire fraud count alleged in the Indictment involves the use of domestic wires in furtherance of the scheme to defraud, and accordingly, the Indictment is not extraterritorial. Hussain is controlling.  There, the government charged a U.K. citizen with wire fraud, conspiracy to commit wire fraud, and securities fraud in connection with his fraudulent inflation of a U.K. company's revenue.  972 F.3d at 1140-41.  The Ninth Circuit held that the wire fraud charges involved the domestic use of wires where they were based on video conference calls between the U.K. and California, emails beginning and ending in California, and three press releases sent from the U.K. to California.  Id. at 1140-41, 1145.  Similarly, the wire fraud counts here involve emails to and from the CDCA (Counts Two and Eight) and wire transfers of funds from two accounts held in the CDCA (Counts Three through Seven, Nine, and Ten).  Thus, here, as in Hussain, "[s]ince each count of wire fraud involved the use of a domestic wire, each [count] is a domestic application of the statute."  Id. at 1145.  The Court's inquiry should end there, and the Perfectus and Warehouse defendants' motion should be denied.

### 1.   An Analysis of Whether the Wires were Merely Incidental Is Not Required

Because they cannot dispute the clear domestic nexus of each wire fraud count, defendants claim that the charged wires were merely "incidental" to the overall scheme.  (Def. Mot. at 13-15.)

9

1       Hussain does not endorse that analysis.  The Ninth Circuit's

2   rule is simpler: because (1) a domestic application occurs when the

3   conduct relevant to the statute's focus occurred in the U.S., and

4   (2) the focus of the wire fraud statute is the misuse of the wires,

5   wire fraud charges based on domestic wires involve a domestic

6   application of the statute.  Hussain, 972 F.3d at 1143-45.  This is

7   exactly the case here.

8       In a footnote, the Ninth Circuit noted that the First Circuit

9   (in a footnote) suggested that an incidental analysis could be

10  required where "a foreign defendant is alleged to have committed wire

11  fraud against a foreign victim."  Hussain, 972 F.3d at 1144 n.2

12  (quoting United States v. McLellan, 959 F.3d 442, 470 n.7 (1st Cir.

13  2020)).  Even assuming that theoretical exception exists, defendants

14  mischaracterize it.  They claim it applies when there is no "domestic

15  victim" (Def. Mot. at 13-14), but the footnote in Hussain

16  contemplates a scenario in which not only the victims but also the

17  defendants are foreign, 972 F.3d at 1144 n.2.  This is not such a

18  case.  The Warehouse and Perfectus defendants are U.S. defendants

19  (Ind. ¶¶ 11, 15, 16, 19; Declaration of Poonam G. Kumar ("Kumar

20  Decl.") Ex. A-C[5]); indeed, defendants do not dispute that Perfectus

21

22      [5] The indictment sufficiently pleads each element of the wire
    fraud offense, see Fed. R. Crim. P. 7, and defendants do not now
23  argue otherwise.  Since the government was not required to plead any
    facts related to extraterritoriality, the Court may consider
24  information proffered herewith in deciding defendants' motion to
    dismiss based on extraterritoriality.  See United States v. Firtash,
25  392 F. Supp. 3d 872, 883 (N.D. Ill. 2019) ("Although the government
    may only charge extraterritorial conduct that falls within the
26  purview of a statute, an indictment is not necessarily rendered
    insufficient for lack of factual allegations conclusively
27  demonstrating the requisite connection.  And where there is a
    credible disagreement over what conduct the government is criminally
28  charging, or whether that conduct falls within the extraterritorial

*(footnote cont'd on next page)*

1  "was incorporated in California with its principal office located in

2  Ontario, California" (Def. Mot. at 10).  Moreover, notwithstanding

3  defendants' repeated use of the phrase "foreign investors," as

4  disclosed in discovery to defendants nearly nine months ago, there

5  were U.S. investors during the relevant period.  (Kumar Decl. Exs. D-

6  F.)  Thus, this fraud involved not only domestic defendants but

7  domestic victims too.  Accordingly, even if an analysis of whether

8  the wires were incidental may <u>ever</u> be required based on the footnote

9  in <u>Hussain</u>, no such analysis would be required here.

10            2.    The Wires Were Central to the Scheme to Defraud

11        Even if the Court were to consider whether the wires charged

12  were merely incidental to the wire fraud scheme, it is clear from the

13  facts that the charged wires were central to the scheme.  The wires

14  alleged in Counts Two through Ten of the Indictment further the core

15  of the alleged criminal conduct.  Specifically, Counts Two through

16  Seven, Nine, and Ten relate to payments and a request for payment by

17  the Perfectus defendants for aluminum from defendant CZW and its

18  surrogates.  These are the very transactions that the government

19  alleges defendant CZW used to fraudulently inflate its revenue and

20  failed to properly report as related party transactions.  Count Eight

21  relates to a request by the former CEO of the Perfectus defendants to

22  defendant CZW asking for funding to support their operations.  Such

23  an email shows that – contrary to the public and repeated statements

24  by defendant CZW – the Perfectus defendants were controlled by

25

26  scope of a statute, it is not impermissible for the court to reach
   beyond the indictment to factual allegations in the government's
   pleadings."); see also United States v. Ballestas, 795 F.3d 138, 149
27  (D.C. Cir. 2015) (holding that the "district court did not err when
   it assumed the truth of the proffered facts in denying [the
28  defendant's] motion [to dismiss], including whether the pertinent
   vessel was subject to the jurisdiction of the United States").

1  defendants CZW and Liu and that defendants CZW and Liu funded the
2  Perfectus defendants' purchase of aluminum from defendant CZW.
3  Accordingly, each of the substantive counts alleged is central to "a
4  core component of [the] fraud" alleged in the Indictment.  Hussain,
5  972 F.3d at 1144 n.2 (noting that, to the extent it mattered, the
6  video calls, emails, and press releases that began or ended in the
7  U.S. were sufficiently central to the scheme).

8          3.   There Are Substantial Contacts Between the Charged
9               Conduct and the United States

10         As set forth above, the Ninth Circuit requires only that this
11 Court determine whether each wire fraud count alleges a domestic use
12 of a wire, which the Indictment undisputedly does.  Despite this,
13 defendants raise the irrelevant contention that the wire fraud counts
14 involve the government's attempts to "'police foreign individuals'
15 and 'foreign organizations' on 'matters completely unrelated to the
16 United States.'"  (Def. Mot. at 15 (quoting United States v.
17 Sidorenko, 102 F. Supp. 3d 1124, 1132 (N.D. Cal. 2015).)  Not so.
18 This case involves "United States citizens, events that occurred in
19 or passed through the United States, and/or events that directly
20 affect the territory or agencies of the United States." Sidorenko,
21 102 F. Supp. 2d at 1131.  The Perfectus and Warehouse defendants –
22 each of which is a U.S. company – used people, funds, and property
23 based in the U.S. to execute a wire fraud scheme against investors in
24 defendant CZW based in the U.S. and elsewhere.  Indeed, the scheme
25 involved substantial conduct occurring within the U.S., including but
26 not limited to, the following:

27     • eight of the 10 charged defendants are U.S. citizens, U.S.
         companies, U.S. residents, or U.S. Legal Permanent Residents
28       (Ind. ¶¶ 1, 10-11, 15-16, 19, Kumar Decl. Exs. A-C);

                                    12

- defendants imported aluminum, including 2.2 million "aluminum pallets", through U.S. ports, including the Port of Long Beach and Los Angeles (Ind. ¶¶ 33(h), (x), (y));

- defendants stockpiled the imported aluminum in warehouses with more than 2 million square feet of storage space in Southern California owned by the Warehouse defendants (Id. ¶¶ 33(j), (x), (bb));

- the Perfectus defendants managed the importation of the aluminum and payment of the imported aluminum using employees based in offices in Ontario and Irvine, California (Id. ¶¶ 12, 34 (OAs 27, 28, 29, 31, 32, 33, 34, 37, 38, 42, 43, 44, 46-53, 55-57, 59, 61, 67, 68);

- a meeting was held at a warehouse owned by defendant Main Street in Irvine, California, in which the co-conspirators discussed ways in which to circumvent AD/CVD duties (Id. ¶ 34 (OA 16));

- defendant Liu purchased and attempted to build a facility in Southern California to melt the imported aluminum (Id. ¶ 34 (OA 36));

- defendant Liu transferred and caused the transfer of $200 million into and out of a bank account held in Southern California that was then used in connection with defendant CZW's IPO (Id. ¶ 34 (OAs 1, 3-6); and

- defendants transferred and caused the transfer of hundreds of millions of dollars into and out of bank accounts held in California to pay for the aluminum manufactured by defendant CZW (Id. ¶ 33(m)).

Indeed, approximately 85 of the 98 overt acts alleged in the Indictment took place in the U.S. (See generally Ind. ¶ 34.)

The extensive contacts between defendants' scheme and the U.S. distinguish this case from those defendants cite. See Petroleos Mexicanos v. SK Eng'g & Constr. Co. Ltd., 572 Fed. Appx. 60, 61 (2d Cir. July 16, 2014) (holding that litigation involving foreign parties that possessed only "three minimal contacts with the United States" had an insufficient domestic nexus); United States v.

13

1   Prevezon Holdings, Ltd., 122 F. Supp. 3d 57, 71 (S.D.N.Y. 2015)

2   (holding that a single wire transfer between accounts held in foreign

3   countries that was routed through New York had an insufficient

4   domestic nexus); Laydon v. Mizuho Bank, Ltd., No. 12-CV-3419-GBD,

5   2015 WL 1515487, at *8-9 (S.D.N.Y. Mar. 31, 2015) (holding that

6   complaint "based on the alleged actions of foreign and international

7   institutions that submitted false information to" foreign banks using

8   "electronic chats routed through electronic servers located in the

9   United States" had an insufficient domestic nexus); Sidorenko, 102 F.

10  Supp. 3d at 1126, 1131-32 (holding that charges against foreign

11  nationals charged with bribing a foreign national to obtain benefits

12  for a foreign company from an agency that received funds from the

13  U.S. had an insufficient domestic nexus).[6]

14      Indeed, the instant case's contacts with the U.S. exceed the

15  contacts that were present in cases where the domestic application of

16  the wire fraud statute was upheld.  See, e.g., Pasquantino v. United

17  States, 544 U.S. 349, 371 (2005) (rejecting extraterritoriality claim

18  where U.S. citizens used interstate telephone calls in wire fraud

19  scheme to smuggle liquor to defraud a foreign nation of tax revenue);

20  United States v. Elbaz, 332 F. Supp. 3d 960, 967, 974-75 (D. Md.

21  2018) (rejecting extraterritoriality claim in case against foreign

22

23      [6] The Supreme Court's recent decision in Nestle USA, Inc. v.
    Doe, --- S. Ct. ----, 2021 WL 2459254 (U.S. June 17, 2021), is
24  similarly inapposite.  In Nestle, the Supreme Court held that the
    plaintiffs sought an impermissible extraterritorial application of
25  the Alien Tort Statute where plaintiffs, who were foreign nationals,
    alleged they were injured outside of the United States by individuals
26  outside of the U.S. from whom the defendants purchased cocoa powder.
    Id. at *2-3, and 5.  The Supreme Court held that the general
27  corporate activity of the defendants in the U.S. was insufficient to
    establish a domestic nexus.  Id.  Here, as set forth above, the
28  indictment alleges far more occurred in the U.S. than general
    corporate activity.

1  defendant who operated a foreign company where wires were sent to
2  victims in the U.S.); United States v. Gasperini, No. 16-CR-441-NGG,
3  2017 WL 2399693, at *8-9 (E.D.N.Y. June 1, 2017) (rejecting
4  extraterritoriality claim in case against foreign national operating
5  abroad and targeting U.S. computers where wires were transferred
6  through a leased server in New Jersey); United States v. Napout, 963
7  F.3d 163, 180-81 (2d Cir. 2020) (rejecting extraterritoriality claim
8  where foreign defendants used an American bank account to receive
9  bribes and cash generated by wire transfers originating in the U.S.);
10 United States v. Coffman, 771 F. Supp. 2d 735, 736, 738 (E.D. Ky.
11 2011) (rejecting extraterritoriality claim where investment fraud
12 scheme executed in Canada against Canadian investors used the U.S.
13 mail and interstate wires to execute the crime); United States v.
14 Kazzaz, 592 Fed. Appx. 553, 554-55 (9th Cir. 2014) (rejecting
15 extraterritoriality challenge to guilty plea factual basis because
16 stipulation to using electronic communications to transmit a payment
17 to a bank in Alabama provided sufficient domestic nexus for wire
18 fraud); United States v. Hayes, 99 F. Supp. 3d 409, 421 (S.D.N.Y.
19 2015) (rejecting extraterritoriality claim where defendant conducted
20 fraud scheme from overseas but used domestic wires to execute
21 scheme); United States v. Singhal, 876 F. Supp. 2d 82, 97 (D.D.C.
22 2012) (rejecting extraterritoriality challenge to mail fraud charges
23 where scheme was executed by mailings from overseas company to U.S.,
24 because the use of U.S. mail makes further analysis of
25 extraterritoriality unnecessary).
26     For the reasons set forth above, the Indictment as charged does
27 not seek an extraterritorial application of the wire fraud statute,
28 and defendants' motion should be denied.

15

### B.    The Wire Fraud Statute Applies Extraterritorially

If the Court determines that the Indictment seeks a foreign application of the wire fraud statute, defendants' motion should nevertheless be denied because the wire fraud statute applies extraterritorially.  While the Ninth Circuit declined to decide this issue in Hussain, 972 F.3d at 1143, the wire fraud statute explicitly criminalizes frauds committed by means of wires in "foreign commerce."  18 U.S.C. § 1343.  "[S]o this is surely not a statute in which Congress had only 'domestic concerns in mind.'"  Pasquantino, 544 U.S. at 372; see also United States v. Georgiou, 777 F.3d 125, 137-38 (3d Cir. 2015); but see European Cmty v. RJR Nabisco, 764 F.3d 129, 141 (2d Cir. 2014) rev'd on other grounds, 136 S. Ct. 2090 (2016).  By including this language, Congress affirmatively indicated its intent for the statute to apply extraterritorially.

## V.    THE INDICTMENT STATES THE OFFENSE OF CUSTOMS FRAUD

In Counts 11 through 17, the Indictment alleges that defendants passed false and fraudulent papers through a customhouse, in violation of 18 U.S.C. § 545, by falsely claiming that AD/CVD duties were not owed on the importation of extrusions welded into the form of pallets.  Defendants claim these counts must be dismissed because they fail to allege that defendants sold the smuggled aluminum in the U.S., and thus, according to defendants, the "harm the AD/CVD duties were intended to address did not occur."  (Def. Mot. at 16-17.)  This argument misapprehends the pleading requirements for an indictment.

An Indictment is sufficient if it "contains the elements of the offense charged and fairly informs a defendant of the charge against him which he must defend [and] enables him to plead an acquittal or conviction in bar of future prosecutions for the same offense."

16

1    United States v. Lazarenko, 564 F.3d 1026, 1033 (9th Cir. 2009)

2    (internal quotation marks omitted); see also Fed. R. Crim. P. 7(c)(1)

3    (requiring an indictment to be a "plain, concise, and definite

4    written statement of the essential facts constituting the offense

5    charged").  Notably, defendants never cite the elements of Section

6    545.  Had they done so, the flaw in their argument would have been

7    clear: whether the harm intended to be addressed by the AD/CVD order

8    occurred is not an element of Section 545.  The elements are simply

9    that (1) the defendant knowingly passed a Form 7501 through a

10   customhouse of the U.S.; (2) the defendant knew that the Form 7501

11   was false, forged, or fraudulent; (3) the defendant acted willfully

12   with intent to defraud the U.S.;  and (4) the Form 7501 had a natural

13   tendency to influence, or was capable of influencing, action by the

14   U.S.  Ninth Circuit Model Jury Instruction No. 8.36 (2010 ed.).

15       The Indictment need not allege (and the government need not

16   prove at trial) that the smuggled products were eventually sold in

17   the U.S.  The commission of the Section 545 offenses charged is

18   complete when the defendant, with the requisite mens rea, passes a

19   materially false or fraudulent document through a customhouse.  Cf.

20   Shaw v. United States, 137 S. Ct. 462, 467 (2016) ("We have found no

21   case from this Court interpreting the bank fraud statute as requiring

22   that the victim bank ultimately suffer financial harm, or that the

23   defendant intend that the victim bank suffer such harm.") (internal

24   quotation marks omitted); United States v. Staggs, No. 18-CR-385-SI,

25   2020 WL 7625229, at *1 (D. Or. Dec. 22, 2020) (noting that a loss to

26   the IRS is "not an element of his count of conviction under 26 U.S.C.

27   § 7206(1)," which prohibits filing a false tax return); United States

28   v. Chen, 324 F.3d 1103, 1104 (9th Cir. 2003) (holding that

17

materiality for purposes of 18 U.S.C. § 1001 prosecution did not require proof that government was actually misled).

Here, the Indictment alleges each of the elements of Section 545. And though the defendant does not challenge the specificity of the charging document, the 53-page Indictment describes the Section 545 counts with more than sufficient detail so defendants may prepare a defense now and plead double jeopardy in the future. (Ind. ¶¶ 39-40, 34.)[7] In other words, the Indictment does all that the Federal Rules of Criminal Procedure require. See United States v. Tavelman, 650 F.2d 1133, 1137 (9th Cir. 1981) (rejecting argument that drug conspiracy count that did not allege overt act was defective because the commission of an overt act is not an element of the federal drug conspiracy statute). For these same reasons, the conspiracy to commit customs fraud sufficiently alleges an offense. Defendants' motion to dismiss the customs fraud charges should be denied.

## VI. DEFENDANTS' ARGUMENT AS TO THE CONSPIRACY TO COMMIT WIRE FRAUD IS MISPLACED

As set forth above, the Indictment alleges a conspiracy, in violation of 18 U.S.C. § 371, in Count One. The defendants are alleged to have conspired: (1) to defraud the U.S. and (2) to commit substantive offenses. (Ind. ¶ 32.) The offenses that are the objects of the § 371 conspiracy are wire fraud, customs fraud, and

---

[7] The defendants also imply that as a matter of law, the importation of CZW's aluminum pallets did not implicate the AD/CVD order. (Def. Mot. at 17. ("[D]efendants' conduct did not implicate the AD/CVD duties.").) This argument is peculiar, as the indictment alleges that the defendants imported defendant CZW's aluminum pallets into the U.S., and the Federal Circuit has held, as a matter of law – in an opinion that the defendants nowhere cite — that defendant CZW's pallets were subject to the AD/CVD order. Perfectus Aluminum Inc. v. U.S. Aluminum Extrusions Fair Trade Comm., 836 Fed. Appx. 883, 887-88 (Fed. Cir. 2020).

1  international promotional money laundering.  (Ind. ¶ 32(a)-(c).)

2       Defendants seek to dismiss Count One because they claim the

3  failure to pay AD/CVD duties to the U.S. does not amount to

4  deprivation of "money or property" for purposes of the wire fraud

5  statute.  (Def. Mot. at 18-21.)  In so arguing, defendants address

6  only the second means of violating § 371, namely, the conspiracy to

7  commit the substantive offense of wire fraud.[8]  However, the

8  Indictment does not rely on the failure to pay AD/CVD duties to

9  support the conspiracy to commit wire fraud.  Rather, the property at

10 issue for this charge (as well as the wire fraud substantive counts)

11 is the funds belonging to investors in defendant CZW.[9]  (Ind.

12 ¶ 33(a)(i).)  Accordingly, defendants' argument about whether the

13 U.S. has a sufficient property interest in $1.8 billion in AD/CVD

14

15      [8] The conspiracy to defraud the U.S. does not require the taking
16 of money or property.  United States v. Smith, 891 F.2d 703, 713 (9th
   Cir. 1989) ("A conspiracy to defraud the United States under 18
17 U.S.C. § 371 does not require an agreement to defraud the government
   of money or property."); see also Ninth Circuit Model Criminal Jury
18 Instruction No. 8.21 (2010 ed.)  As such, defendants' argument
   regarding the scope of "money or property" is irrelevant as to the
19 "scheme to defraud" manner of violating § 371.

20      [9] A § 371 conspiracy to commit substantive offenses does not
   require that the victim of the offense be the U.S.  See Ninth Circuit
21 Model Criminal Jury Instruction No. 8.20 (2010 ed.); United States v.
   Falcone, 960 F.2d 988, 990 (11th Cir. 1992) (en banc) ("[I]n
22 establishing a conspiracy 'to commit any offense against the United
   States,' the government need not allege or prove that the United
23 States or an agency thereof was an intended victim of the
   conspiracy."); United States v. Brandon, 17 F.3d 409, 422 (1st Cir.
24 1994) (holding that "any offense' clause of § 371" . . . "does not
   refer to a particular victim of a crime like the second clause does,
25 but instead applies generally to federal 'offenses.'"); United States
   v. Gabrion, 517 F.3d 839, 854-55 (6th Cir. 2008) ("It has long been
26 established that the words 'offense against the United States
   encompasses all offenses against the laws of the United States, not
27 just offenses directed at the United States as target or victim."
   (citations omitted)); see also United States v. Bonanno, 852 F.2d
28 434, 436, 440-41 (9th Cir. 1988) (affirming conviction for § 371
   conspiracy to commit wire fraud where defendants defrauded investors
   in corporation).

1  duties is irrelevant and their motion on this point should be

2  denied.[10]

3  **VII. CONCLUSION**

4      For the foregoing reasons, the government respectfully requests

5  that this Court deny defendants' motion to dismiss.

6

7

8      [10] The basis of defendants' motion to dismiss this non-existent
   allegation is that the government was not deprived of "money or
9  property" by defendants' scheme to evade $1.8 billion in AD/CVD
   duties.  In making this argument, defendants rely on Cleveland v.
10 United States, 531 U.S. 12, 20-22 (2000) and Kelly v. United States,
   140 S. Ct. 1565, 1573 (2020).  These cases, which hold that the
11 government's regulatory ability is not a traditional property right,
   are inapposite.  The Supreme Court's decision in Pasquantino
12 forecloses defendants' argument.

13     In Pasquantino, the defendants failed to declare liquor imported
   to Canada and evaded paying Canada excise tax.  544 U.S. at 353.  The
14 Supreme Court noted that "[t]he right to be paid money has long been
   thought to be a species of property."  Id. at 356.  As such, the
15 Supreme Court held that Canada's right to uncollected excise tax on
   imports was "money or property" for purpose of the wire fraud
16 statute.  Id.  The Supreme Court distinguished its holding in
   Cleveland, stating that the government's right to uncollected excise
17 taxes on imports was an "economic" interest and not a regulatory
   interest.  Id. at 356-57; United States v. Maddux, 917 F.3d 437, 441
18 (6th Cir. 2019)(holding that government had the right to uncollected
   taxes on cigarette sales where defendants falsely categorized the
19 sale of cigarettes as the sale of gifts, novelties, and souvenirs);
   see also United States v. Ali, 620 F.3d 1062, 1065, 1067 (9th Cir.
20 2010) (scheme to defraud victim of right to full payment for product
   qualified as "money or property" under mail and wire fraud statutes).
21 Defendants' attempt to distinguish Pasquantino by arguing that they
   did not hide the aluminum extrusions and thus, complied with their
22 "legal obligation" is unavailing.  Defendants avoided paying $1.8
   billion in duties by falsely claiming on customs forms that aluminum
23 pallets were not subject to duties when they were, so they did not,
   as the indictment specifically alleges, comply with their legal
24 obligations.  (Ind. ¶¶ 30, 33(a)); see Maddux, 917 F.3d at 441-42
   (upholding wire fraud convictions for defendants who falsely claimed
25 sales of cigarettes as sales of gifts, novelties, and souvenirs as
   part of scheme to avoid paying cigarette taxes).  The indictment also
26 sufficiently alleges that defendants were obligated to pay the AD/CVD
   duties.  (See, e.g., Ind. ¶¶ 28, 33(y), (aa)); see also United States
27 v. Boren, 278 F.3d 911, 914 (9th Cir. 2002) (court required to accept
   allegations in indictment as true).  Defendants' arguments are
28 contrary to law and, to the extent reached by the Court, should be
   denied.